# Daughdrill *v.* The State.

### Indictment for Murder.

1. *Construction of statute regulating the impannelling of a grand jury for Etowah county; provisions of said statute valid under constitution.*—The statute approved February 21, 1893, entitled "An act to authorize the judge of the ninth judicial circuit to direct when a grand jury should be drawn, summoned and impannelled in the circuit court of Etowah county" (Acts 1892–93, p. 1193), providing that thereafter no grand jury shall be drawn, summoned or impannelled in the circuit court of said county, unless, in the opinion of the presiding judge, a grand jury should be impannelled, and, after making the provision for the entry of the order therefor, and how the grand jury should be drawn, summoned and impannelled, then contains a proviso that nothing in said act shall prevent the presiding judge from causing a grand jury to be impannelled for said court, as now provided by law in cases where no grand juries have been drawn, or in cases where the venire has been quashed (Code of 1886, § 4316), such proviso is clearly covered by the caption of the act, is valid and binding, and the statute itself is not subject to constitutional objections, as being violative of Article IV, § 2 of the constitution, which provides that each law shall contain but one subject, which shall be clearly expressed in its title.

2. *Same; such proviso not repugnant to the body of the act.*—The proviso contained in the statute, approved February 21, 1893, containing the provisions as stated above, is not, in any sense, repugnant to the body of the act, but is clearly within the terms of the inhibition contained therein, limited as that inhibition is to circumstances under which the judge is not of the opinion that the grand jury should be impannelled.

[Daughdrill v. The State.]

3. *Same; when grand jury properly drawn, summoned and impannelled during a term.*—While, under the act approved February 21, 1893, authorizing the judge of the ninth judicial circuit to direct when a grand jury should be drawn, summoned and impannelled in the circuit court of Etowah county, it is generally necessary that the order for the impannelling of the grand jury should be entered upon the minutes of the court at the term preceding the one at which the jury is to be impannelled; yet, under the provisions of the proviso of said act, the presiding judge of such court can, in term time, by order entered on the minutes, cause a grand jury to be drawn, summoned and impannelled for that term of the court, as provided by section 4316 of the Code, notwithstanding an order had not been therefor at the preceding term, if, in his opinion, a grand jury should be impannelled at such term, no grand jury having been returned to serve at such term by reason of the provisions of such act; and an indictment preferred by such grand jury is valid and should not be quashed.

4. *Change of venue; revision on appeal; presumption in favor of judgment.*—In revising a refusal to change the venue in a criminal case, this court indulges the presumption of correctness in the ruling of the trial court, and will not reverse unless error affirmatively appears.

5. *Same; case at bar.*—On an application for a change of venue in a criminal case, there was offered in support of the application the affidavits of twenty-five citizens of the county, who stated therein that in their opinion, based upon the expressions and discussions of other people which they had heard, the defendant could not obtain a fair and impartial trial in the county, and there was also introduced a newspaper article, inflammatory in character, describing the crime. As opposed to these affidavits, the State offered the affidavits of fifty-three citizens, who stated therein that in their opinion, which was based upon the expressions, discussions and sentiment they had heard from different citizens in the county, the defendant could obtain a fair trial. *Held:* the application was properly refused.

6. *Venire in capital cases; motion to quash.*—Under the provisions of the statute regulating the drawing of petit jurors in a capital case, the failure of the sheriff to find three persons whose names were on the list of jurors drawn by the court and ordered to be summoned for the trial, is no ground for quashing the venire.

7. *Order for special term of court; validity thereof.*—It is not essential to the validity of an order for a special term of court (Code of 1886, § 752), that it should be entered upon the minutes of the term at which the order was made. Such order is that of the judge and not of the court; and all that is necessary is that it should be entered upon the minutes of the special term, and the fact that the order happened to be made during a term does not change this rule.

8. *Organization of jury in capital cases; sufficiency of grounds for challenging juror for cause.*—The fact that a juror stated on the *voir*

[Daughdrill v. The State.]

*dire* that, if what he heard was true, defendant ought to be hung, affords no ground for challenge, when he further deposes that he did not assume the reports to be true and had no fixed opinion as to defendant's guilt or innocence, which would bias his judgment.

9. *Drawing jury for special term; no objection that they were drawn more than ten days before the trial.*—The requirement of the statute (Code of 1886, § 4319), that the venire for the trial of a felony case at a special term should be drawn ten days before such term, is intended to secure ample time for summoning the jurors; and it constitutes no objection to the venire that it was drawn more than ten days before the commencement of the term; the purpose of such requirement being obviously complied with.

10. *Evidence; dying declarations message to another.*—Where it is shown that deceased had received a dangerous wound and stated several times that he was dying, and wanted witness to take a message to his wife, and was gasping for breath at the time he was talking, and trembling from fear or excitement, a sufficient predicate is laid for the admission of a statement made at that time, as a dying declaration; and it is no objection to its admission that such declaration took the form of a message to another.

11. *Murder in first degree; definition of deliberate and premeditated.* In a homicide, if, before striking, the slayer has time to think, though it be only an instant, even a single moment, and does think, and after having thought, strikes the blow as the result of an intention to kill, produced even by this momentary operation of the mind, and death ensues, there is deliberation and premeditation on the part of the slayer, within the meaning of the statute (Code of 1886, § 3725), and the homicide is murder in the first degree.

12. *Same; same; misleading charges.*—Charges, which, when referred to the evidence in the case, instructs the jury that to constitute murder in the first degree the defendant should have time and opportunity to thoroughly ponder upon the act and its consequences, and resolve upon its commission before and disconnected from the act itself, are misleading in their definition of the deliberation and premeditation which are essential ingredients of murder in the first degree and should, therefore, he refused.

13. *Same; same; erroneous charge to the jury.*—In a trial for murder, where the evidence shows that the rencounter resulting in the homcide occupied only a few moments of time, a charge is erroneous which instruct the jury that "Unless the jury are satisfied * * * that there was a preconceived purpose on the part of the defendant at the time of the shooting of Bates to take his life, and the jury have not an abiding conviction to a moral certainty, and the evidence is not so strong and convincing as to exclude every reasonable supposition or hypothesis, that the defendant at the time of the shooting had in his mind this preconceived purpose to take the life of Bates, they can not find him guilty of murder in the first degree;" such charge having the effect of instructing the jury that the defendant must have formed his purpose to kill, as something apart from its

[Daughdrill v. The State.]

entertainment at the time of the killing, and kept it in mind, or re-called it to mind, when he was about to inflict the fatal wound.

14. *Homicide ; killing the result of a sudden, rash act ; does not reduce it from murder in the first degree.*—Where, on a trial under an indictment for murder in the first degree, it is shown that the defendant and the deceased were entire strangers, and that while the deceased was in conversation with another person, the defendant interrupted them, and upon being rebuked he applied an opprobrious epithet to the deceased, and upon the latter's advancing somewhat towards him, but not in a threatening manner, the defendant drew his pistol and shot him, a charge to the jury which instructs them that if they believe from the evidence "that the killing was the result of a sudden, rash act on the part of the defendant, the jury can not find him guilty of murder in the first degree," is erroneous, misleading, and properly refused.

15. *Same; "clear," "specific" intent to kill not necessary.*—On a trial for murder, a charge which instructs the jury that if they "have not an abiding conviction to a moral certainty, and are not satisfied beyond all reasonable doubt that the defendant, at the time of the shooting, had a clear and specific intent to take the life of Bates, and that the killing was willful, and that it was deliberate, and that it was malicious and that it was premeditated, they can not find the defendant guilty of murder in the first degree," is erroneous and properly refused ; such charge being an effort to add qualifications to the intention to kill, since there is no necessity for the jury to determine whether such intention is "clear" or "specific."

16. *Words or altercation can not reduce homicide to manslaughter.* A mere word or altercation can not reduce a grade of homicide from murder to manslaughter.

17. *Same; reasonable doubt; sufficiency of proof.*—A charge which instructs the jury that if they "are satisfied beyond a reasonable doubt that defendant is guilty of some one of the degrees of homicide, but the evidence leaves it in doubt whether the offense is murder or manslaughter, then the defendant is entitled to the benefit of the doubt, and could only be convicted of manslaughter," is erroneous ; such charge authorizing and requiring the jury to convict of only manslaughter, even though they believed beyond all reasonable doubt that he was guilty of murder.

18. *Same; improper treatment of dangerous wound affords no protection.*—Where a wound upon a deceased is in itself dangerous to life, mere erroneous treatment of it or of the wounded man suffering from it, will afford the defendant no protection against a charge of unlawful homicide.

19. *Same; when charge demanding absolute acquittal upon certain hypothesis is erroneous.*—On a trial under an indictment for murder, an instruction to the jury demanding an absolute acquittal, if it should appear that the wound inflicted by the defendant did not cause the death of the deceased, is erroneous ; since it was open to the jury, had they found that the death of the deceased resulted from im-

proper treatment and not from the wound inflicted by the defendant, to have convicted the defendant under the indictment for an assault with intent to murder; the lesser offense being included in the greater.

APPEAL from the Circuit Court of Etowah.

Tried before the Hon. JAMES A. BILBRO.

The appellant was indicted and tried for the murder of one Joseph Bates, was convicted of murder in the first degree, and sentenced to be hanged.

During the term time of the circuit court of Etowah, to-wit, on May 11, 1896, the judge of the ninth judicial circuit, who was presiding at said court, made the following order : "In the opinion of the presiding judge a grand jury should be impannelled at this term of the circuit court of said county, and no grand jury having been returned to serve at said term, it is ordered by the court that the sheriff forthwith summon eighteen persons qualified to serve as grand jurors to be and appear at the present term of the court, on, to-wit, the 13th day of May, 1896. It is further ordered by the court that this order be entered on the minutes." In obedience to this order, a writ was issued by the circuit clerk, commanding the sheriff to forthwith summon 18 persons who were qualified to serve as grand jurors, to appear at the present term of the circuit court of said county on May 13, 1896. In obedience to this writ, the sheriff summoned 18 named persons, 16 of whom were impannelled, sworn, charged and duly organized as grand jurors on May 13, 1896. This grand jury returned the indictment against the appellant in this case, charging him with the murder of Joseph Bates. The defendant moved to quash the indictment upon the following grounds : "1. Because the indictment or paper purporting to be an indictment, was not preferred by a grand jury summoned, impannelled, sworn and charged according to law. 2. Because the order for the summoning of grand jurors for the present term of this court, as made and entered upon the minutes during the present term of this court, is not authorized by law. 3. Because the order for the summoning of grand jurors for the present term of this court, for the reason or upon the ground set forth in said order, is not authorized by law." This motion was overruled, and the defendant duly excepted. Subsequently an order was made calling a special term

[Daughdrill v. The State.]

of the circuit court of Etowah county for the trial of the cause against the defendant; it being set out in said order that the time fixed by law for the regular term of the circuit court of Etowah county was insufficient for the trial of said cause.

There was an application made for a change of venue, upon the ground that the defendant could not have a fair and impartial trial in Etowah county, where the crime with which he was charged was committed. In support of this petition there were affidavits of 25 citizens of Etowah county, each of which stated in substance that they had heard the case against the defendant generally talked about, and had heard people repeatedly say that the defendant should be hanged, and that in their opinions, which were based upon expressions they each had heard from different people, the defendant, Colie Daughdrill, could not get or have a fair and impartial trial in Etowah county. There was also attached to the application a newspaper article, somewhat inflammatory in its nature, describing the crime.

As opposed to the granting of the application for a change of venue, the State introduced counter affidavits of 53 citizens of Etowah county, in which each of said affiants stated that they were each of the opinion that said Daughdrill could obtain a fair and impartial trial in Etowah county; and that their opinions were based upon the expressions, discussions and sentiment they had heard from different citizens. Upon consideration of the motion for a change of venue, the court denied the application, and the defendant then and there duly excepted to this ruling.

Before going to trial the defendant moved the court to quash the venire of special jurors drawn and returned to the special term of the court and served on the defendant, upon the grounds: 1st. Because the petit jury was drawn more than ten days before the beginning of the special term. 2d. Because the petit jury composing the venire was drawn by the probate judge, clerk and sheriff of Etowah county, on the 3d day of June, 1896, more than ten days before the 29th day of June, 1896, the commencement of the term, and have been continuously published in a newspaper in Etowah county to the latter date. 3d. Because there is no order of the court authorizing or ordering a petit jury to be drawn

[Daughdrill v. The State.]

for the trial of this cause. 4th. Because there is no
order of the court authorizing the order drawing the 50
persons as petit jurors to try this cause at the special
term of the court. 5th. Because the copy of the venire
served on the defendant showed on its face that 50 per-
sons had not been summoned as special jurors to try this
case. 6th. Because the order of the court made on
May 22, 1896, ordering a special term of the court for
the trial of this cause, was void, because said order fails
to show that in the opinion of the judge, such special
term was necessary ; and said order was made in term
time during the sitting of the court, and was not entered
on the minutes of the court. On the hearing of this
motion it was admitted by the State that the jurors com-
posing the copy of the venire served on defendant,
being those summoned for the special term of the court,
were drawn by the probate judge, clerk and sheriff of
Etowah county more than ten days before the beginning
of the special term, and that they were published in the
newspapers of said county on the 3d day of June, 1896,
and from that date continuously to the time of the trial.
It was also admitted by the State that at the regular term
of the court, at which time the special term was called,
no minute entry of the call of this special term was
made, but on a day, viz., the 22d day of May, 1896, dur-
ing the sitting of the regular term of the court, and be-
fore the adjournment of said regular term of the court,
the judge of said court filed with the clerk of the court
the following order : "It appearing that Colin Daugh-
drill is now confined in jail under an indictment for
murder, which is stated on the State docket of said
court, and numbered 1706, and the time fixed by law
for the regular term of this court is insufficient for the
trial of said cause, it is therefore ordered that a special
term of the circuit court for Etowah county be held, be-
ginning on Monday June 29, 1896, for the trial of said
Colin Daughdrill under said indictment, and it is further
ordered that fifty competent jurors be drawn and sum-
moned as provided by law, and that thirty days notice
be given by advertisement of this order in the Gadsden
Times-News, a newspaper published in said county."

The court overruled the motion to quash the venire,
and the defendant duly excepted. The defendant there-
upon objected to being put upon trial at the special term

[Daughdrill v. The State.]

of the court upon substantially the same grounds which were the bases of his motion to quash the venire. The court overruled the objection of the defendant to being put upon trial, and the defendant duly excepted.

Upon the court entering upon the selection of the jury to try the case, J. A. Shores, one of the jurors summoned, when examined on his *voire dire* touching his qualification as a juror, stated that he had no fixed opinion as to defendant's guilt or innocence, which would bias his verdict; but upon cross-examination by the defendant, which was allowed by the court, he stated that he had said, that if reports of the facts were true, defendant ought to be hung; that he did not know whether the reports were true or not, and that he had no bias or prejudice against the defendant that would prevent him giving the defendant a fair and impartial trial. Thereupon the defendant moved the court that said juror Shores be challenged for cause. The court overruled the motion, and the defendant duly excepted to this ruling, and then challenged him peremptorily. Similar examinations were made of, and similar statements were made by, jurors Hopper, Vinson, Guinn and Gaines. Similar motions were made by the defendant for the challenge of each of said jurors for cause, and separate exceptions were reserved to the court's overruling each of said motions.

The circumstances of the killing are sufficiently stated in the opinion.

Upon the introduction in evidence of the physicians who attended Bates after being shot, each of the physicians testified that his death resulted from the pistol wound which was inflicted by the defendant; that the ball passed through one of the lungs of the deceased, and while the wound was not necessarily fatal, that the death of Bates was caused directly by said wound. The physicians on cross-examination stated that for the purpose of alleviating the suffering and in the treatment of the wound, the deceased was given morphine hypodermically; but stated that the death was in no way caused from the morphine.

The State introduced Dr. Cross as a witness, who testified as follows: "I knew Bates, the deceased. I saw him the night he was shot in about 10 minutes after he was shot. Saw him in my drug store in Gadsden,

[Daughdrill v. The State.]

Ala.   I had conversation with him at the time when
they came in the store with him. He said, 'Cross, I have
been shot, and I am dying.' I said alright, lets get down
on the table and get comfortable.   Bates was then 4 or
5 feet from me, and was being held up by three or four
men.   I went to make place for him to lie down on table,
and he said never mind come here, and told me to hurry
up.   I went to him and told the men to . lay dim down
on the floor, and they did so. He said two or three times he
was dying, and then said he wanted me to send a mes-
sage to his wife.   He was very much excited and
wrought up and in a great deal of pain.   He could not
stand up by himself, and when he spoke about my send-
ing a message to his wife he was gasping for breath.
He had the appearance of being very much frightened,
and was all in a tremor.   He was all in a tremble of
fear and excitement.   He did not show any scare, that
I know, of another assault.   I suppose excitement would
be better term to describe his appearance than fright.
I was his friend.   Had known him about two years.
When he made statement to me about the occurrence,
that is the message he sent to his wife, he was gasping
for breath.   He made the statement in 5 or 10 minutes
after he came in."   The State then asked the witness
what Bates said in the message or statement.   The de-
fendant objected to the message or statement made by
Bates to Cross, because it was not shown to be a dying
declaration or statement of the difficulty, but a mere
message to his wife, and because no sufficient predicate
had been laid for the introduction of the statement as a
dying declaration, and because the statement or message
is immaterial and irrelevant to the issue.   The court
overruled the objection of defendant to the introduction
in evidence of said statement or message, and to this 'ac-
tion of the court in admitting said statement or message as
a dying declaration, and allowing it to be detailed to the
jury, the defendant then and there duly excepted.   The
witness then said :   "Bates said to me :   'Tell my wife
that I went into Mr. Barnes' store, and while standing at
the bar talking to Mr. Barnes on business an unknown
man interrupted us by pushing me to one side. I turned
to him and requested that he let us alone as I was there
on business.   I then turned to Mr. Barnes and I was
interrupted a second time.   I again turned to him and

[Daughdrill v. The State.]

told him he must not call me that kind of a name, whereupon the man shot me.' ''

Upon the introduction of all the evidence, the court in its general charge, among other things, instructed the jury as follows: "There is evidence tending to show that after the shooting, the defendant tried to arrange with the officer for his escape. Flight, gentlemen, or an effort made to bring it about, is a circumstance tending to show guilt, if you should believe such effort was made because of a consciousness of guilt. But if there was an effort made by defendant to bring about his escape, and he was not prompted to do this from a sense of guilt, then it amounts to nothing. It is for you to say what the defendant's motive was in trying to arrange for his escape, if he did do so." To this part of the court's general charge the defendant separately excepted. The defendant requested the court to give to the jury many charges, some of which were given. There were 27 charges which the defendant requested in writing, which were refused, and the defendant separately excepted to the court's refusal to give each of them. The 1, 2, 8 and 14 charges are copied in the opinion. The remaining charges which were refused were as follows: (3.) "The court charges the jury that unless the jury are satisfied beyond all reasonable doubt, and have an abiding conviction to a moral certainty to the exclusion of every other reasonable hypothesis but that of the guilt of the defendant, that the defendant deliberated beforehand and contrived and designed previously to the killing to take the life of Bates, or have a reasonable doubt as to this, they can not find him guilty of murder in the first degree." (4.) "Deliberate means formed with deliberation, carefully considering the probable cause, consequence of an act as contra-distinguished from a rash or sudden act, and if the jury are not satisfied beyond all reasonable doubt and to a moral certainty, that the defendant deliberated in his mind and carefully considered the probable consequences of his act, and that the killing was not done with a formed deliberation and premeditation to take the life of Bates, then the jury can not find him guilty of murder in the first degree." (5.) "Deliberate means formed with deliberation, to weigh in the mind the probable consequences of an act, and if the jury after carefully and candidly

[Daughdrill v. The State.]

weighing and considering all the evidence in the case are not satisfied beyond all reasonable doubt and to a moral certainty, and have an abiding conviction that the defendant killed the deceased with formed deliberation after weighing the probable consequences of his act in his mind, they can not find him guilty of murder in the first degree." (6.) "The court charges the jury that before they can convict the defendant of murder in the first degree, they must be convinced from all the evidence in the case beyond all reasonable doubt, and have an abiding conviction to a moral certainty, that the defendant premeditated, that is, that he previously considered and deliberated upon taking the life of Bates before he fired the shot, and that the killing of Bates was not the result of a sudden rash act, on the part of the defendant, and if the jury have a reasonable doubt, and the evidence is not so strong and convincing as to exclude every reasonable supposition or hypothesis that the killing was the result of premeditation and deliberation and that the killing of Bates was not previously considered by the defendant before he fired the shot, but that the killing was the result of a sudden rash act on the part of the defendant, the jury can not find him guilty of murder in the first degree." (7.) "The court charges the jury that the burden of proof is on the State to satisfy the minds of the jury from all the evidence to a moral certainty and beyond all reasonable doubt, that the defendant killed Bates pursuant to a prior determination to take his life, and that his determination to kill was premeditated and the intent to kill was formed distinctly in his mind at the time of the shooting of deceased, and if the jury have not an abiding conviction to a moral certainty, and the evidence is not so strong and convincing as to exclude every reasonable supposition or hypothesis that the defendant had determined beforehand to take the life of Bates, they cannot convict him of murder in the first degree." (9.) "The court charges the jury that unless they are satisfied beyond all reasonable doubt and to a moral certainty that the defendant killed Bates wilfully—that is, being governed by his will, and without yielding to reason—that the killing was done deliberately, that the intent was formed in the mind of the defendant with deliberation in contradistinction to a sudden rash act, that the killing was done maliciously,

2

that is, with fixed hate or done with wicked intentions, that the killing was done with premeditation, that is, that the defendant contrived or designed before hand to take the life of Bates, they cannot find him guilty of murder in the first degree; and if the jury have not an abiding conviction to a moral certainty, and believe, from all the evidence in the case, beyond all reasonable doubt, and the evidence is not so convincing as to exclude every reasonable supposition or hypothesis, as to the existence in the mind of the defendant of either one of these elements; that if they have a reasonable doubt that the defendant killed Bates willfully, or have a reasonable doubt that the killing was done deliberately, or have a reasonable doubt that the killing was done maliciously, or have a reasonable doubt that the killing was done with premeditation, it would be the imperative duty of the jury, under the, law, to give the defendant the benefit of the doubt, and find him not guilty of murder in the first degree.'' (10.) ''The court charges the jury that the burden of proof is on the State to satisfy the minds of the jury beyond all reasonable doubt, and to a moral certainty, that the killing of Bates was accompanied with a clear and specific intent on the part of the defendant to take his life, that the killing was willful, that it was deliberate, that it was malicious and that it was premeditated, and if the jury have not an abiding conviction to a moral certainty, and are not satisfied beyond all reasonable doubt that the defendant, at the time of the shooting, had a clear and specific intent to take the life of Bates, and that the killing was willful, and that it was deliberate, and that it was malicious, and that it was premeditated, they can not find the defendant guilty of murder in the first degree.'' (11.) ''The court charges the jury that the burden of proof is on the State to satisfy the minds of the jury, from all the evidence in the case, beyond a reasonable doubt and to a moral certainty, that the defendant premeditated and determined in his mind before hand, to take the life of Bates, and if the jury have a reasonable doubt that the defendant premeditated and determined to take the life of Bates beforehand, and the evidence is not so' convincing as to exclude every reasonable supposition or hypothesis that the defendant premeditated and determined beforehand to take the life of Bates, they can not

find him guilty of murder in the first degree, although the jury may be satisfied beyond all reasonable doubt that the killing was done willfully, maliciously and deliberately." (12.) "If Bates and defendant engaged in a combat, or if one assailed or attacked the other, and the party assailed maddened thereby and in the immediate heat of blood influenced solely thereby, slay the assailant without any formed design to do the deed, this is manslaughter in the first degree ; and if such is the true solution of this case, the defendant is not guilty of any degree of murder." (13.) "The court charges the jury that if the shot was fired in the heat of passion suddenly aroused in an altercation between defendant and deceased, and without malice, then the defendant is not guilty at all ; could only be convicted of manslaughter." (15.) "If there is a reasonable hypothesis or solution of this case consistent with defendant's innocence, the defendant is entitled to have the case so considered, and if there is such a reasonable hypothesis or solution of the case consistent with defendant's innocence, then defendant is not guilty. Applying this rule to the evidence in this case, if the jury, on consideration of all the evidence, find it is a reasonable solution of the case that the pistol wound was not a dangerous one, and that Bates died from the medicine given him after he received the wound, then the defendant is not guilty of any degree of homicide ; or if it is a reasonable solution from all the evidence that defendant did not bring on the difficulty, and that defendant had good reason to apprehend loss of life or great bodily harm, that there was no reasonable way of escape, and there was no formed design formed to kill, but shot only to defend himself, then defendant is not guilty." (16.) "Although the wound may have been the condition of the death of Bates, yet, if the wound was not dangerous, and if Bates died because of medicine given him after the shot was received, then the wound is not the cause of the death, in law, although a condition of it, and defendant is not guilty." (17.) "If the jury find from the evidence that the character of the pistol wound received by Bates was such that only ten or fifteen per cent. of persons thus wounded die, and if the jury have a reasonable doubt as to whether Bates died from the wound or whether he died of the medicines given him after he received the

wound, then the defendant is not guilty of any degree of homicide." (18.) "If the jury find from the evidence that the pistol wound received by Bates was not a dangerous wound, and if the jury have a reasonable doubt as to whether Bates died of the wound, or from the medicines administered to him after the wound, then defendant is not guilty, and the jury should acquit defendant." (19.) "The court charges the jury that if they are not satisfied beyond all reasonable doubt and to a moral certainty that the wound Bates received from the pistol shot was necessarily fatal, and they further believe that the doctors attending him gave him an overdose of morphine, and the probabilities are that he did not die from the effects of the wound, and the evidence is not so strong and convincing as to exclude every reasonable supposition or hypothesis that the wound was necessarily fatal, and that Bates died from the effects of it, and the probabilities are that Bates died from an overdose of morphine, and the jury have a reasonable doubt as to the cause of Bates' death, the defendant would be entitled to the benefit of the doubt and an acquittal at their hands." (20.) "The court charges the jury that a probability of the defendant's innocence is a just foundation for a reasonable doubt of his guilt, and, therefore, for his acquittal; and if the jury have not an abiding conviction to a moral certainty, and the evidence is not so strong and convincing as to exclude every reasonable supposition or hypothesis that the wound received by Bates was necessarily fatal, and that he died from an overdose of morphine, they can not find the defendant guilty as charged in the indictment." (21.) "The court charges the jury in determining the cause of the death of Bates, it is their duty to ascertain from the evidence what the doctors and those attending Bates did, the kind of medicine they gave, whether poisonous, and how often he took the medicine, his condition after death, and if, after considering all this in connection with all the other evidence in the case, they have not an abiding conviction to a moral certainty, and the evidence is not so strong and convincing as to exclude every reasonable supposition or hypothesis as to the cause of Bates' death, or if they have a reasonable doubt as to the cause of his death, the defendant is entitled, under the law, to the benefit of the doubt

[Danghdrill v. The State.]

and a verdict of not guilty." (22.) "The court charges the jury that the opinions of the doctors who testified in the case are to be considered by the jury in connection with all the other evidence in the case. They should not act upon these opinions to the exclusion of all other evidence in the case. The jury will take the opinions and the facts and circumstances that may be in evidence, and from which these opinions may have been formed, and consider them in connection with all the evidence in the case, and if. after so considering the evidence, they have not an abiding conviction to a moral certainty, and the evidence is not so strong and convincing as to exclude from the minds of the jury every reasonable supposition or hypothesis that the wound inflicted on Bates was necessarily fatal or dangerous, and that Bates did not die from the effects of the wound, they can not find the defendant guilty as charged in the indictment." (23.) "The court charges the jury that the opinions of the doctors who testified in the case are to be considered by the jury in connection with all the other evidence in the case. They should not act upon these opinions to the exclusion of all the other evidence in the case. The jury will take these opinions and the facts and circumstances that may be in evidence and from which these opinions have been formed and consider them in connection with all the other evidence in the case, and if after so considering the evidence they have not an abiding conviction to a moral certainty, and the evidence is not so strong and convincing as to exclude from the minds of the jury every reasonable supposition or hypothesis, that the wound inflicted on Bates was necessarily dangerous and that Bates did not die from the effects of the wound, they can not find the defendant guilty as charged in the indictment." (24.) "The court charges the jury that before the jury can convict the defendant of any offense they must be satisfied beyond all reasonable doubt that the deceased, Bates, died from the effects of the wound inflicted by the defendant, and if the jury have not an abiding conviction to a moral certainty that Bates died from the effects of the pistol shot, and the evidence is not so strong and convincing as to exclude every reasonable supposition or hypothesis that the deceased, Bates, died from the pistol shot, they can not find the defendant guilty as charged

in the indictment." (25.) "The court charges the jury that if they are not satisfied beyond all reasonable doubt and to a moral certainty, that the wound received by the deceased, Bates, was the cause of his death, and the evidence is not so strong and convincing as to exclude every reasonable supposition or hypothesis that he did die from the effects of the wound inflicted by the defendant, or if they have a reasonable doubt as to whether he died from the effects of an overdose of morphine or other poison, or that he died from the wound, the defendant is entitled to the benefit of the doubt, and an acquittal at their hands." (26.) "The court charges the jury that the burden of proof is on the State to satisfy the minds of the jury beyond all reasonable doubt and to a moral certainty that the wound inflicted on Bates was necessarily mortal or dangerous, and if the jury have a reasonable doubt as to this the defendant is entitled to the benefit of the doubt and a verdict of not guilty." (27.) "If the jury have a reasonable doubt whether the wound was dangerous or mortal, and they have a reasonable doubt whether the deceased, Bates, died from the effects of the wound, and have not an abiding conviction to a moral certainty, and the evidence is not so strong and convincing as to exclude from their minds every reasonable supposition or hypothesis, that the wound was mortal or dangerous and that Bates did not die from the wound, they can not find the defendant guilty."

W. H. DENSON and DAVIS & HARALSON, for appellant.
1. The motion to quash the indictment should have been granted.

The circuit judge had no authority to impannel the grand jury which presented the indictment. The grand jury was not authorized by law, and its presentments are void. By an act of the legislature, approved on the 21st day of February, 1893, the law was so amended as to Etowah county that in the circuit court of said county no grand jury can be impannelled in said court unless at a prior term of the court the judge of said court makes an order requiring a grand jury to be drawn. See Acts 1892-93, p. 1193. In the case at bar, no such order had been made at the previous term of the court. The order for the grand jury was made at the term of the court

[Daughdrill v. The State.]

during which it was organized—the order being made on the 11th day of May, and the grand jury being organized on the 13th day of May. The intention of the legislature, and the effect of the act approved on said 21st of February, 1893, above cited, was to repeal, so far as the county of Etowah is concerned, section 4316 of the Criminal Code. From the reading of the whole, it is clear that it was the intention of the legislature in passing it, to prevent the organization of a grand jury in the circuit court of Etowah county except where it had been orded at a previous term of the court. This idea is augmented by the fact that in the city court of Gadsden, in Etowah county, a grand jury is provided for by law, and it exercises jurisdiction over the whole county. The proviso in said act of 1893, does not militate against this position. The proviso in the act as to cases "where no grand juries have been drawn," is repugnant to the body of the act. It can not, therefore, stand.—Endlich on Interpretation of Statutes, 185. But if otherwise, and the proviso must stand, then the whole statute, proviso and all, must be construed together so as to give each a field of operation. The proviso surely does not enlarge the general statute—4316. At most, the effect of the proviso can be only to authorize the enforcement in certain instances of 4316. Our insistence is this : That 4316 is not called into play by virtue of said act of 1893, unless the judge of the court at a previous term has ordered a grand jury to be drawn, and for some reason it has not been drawn by the officers charged with that duty. In such event, the section, 4316, becomes effective, and the judge can order a grand jury summoned. Under the general law, it is not the province of the judge to order a grand jury drawn. He can only do so when the officers charged with that duty have failed.

In the case at bar, no officers were charged with that duty in the absence of the judge's order at the preceding term of court. The proviso, then, to act of 1893 does not become operative. In no instance has section 4316 been given force, except where the officers charged with drawing or summoning jurors have failed.

In the case at bar the officers could not have failed either to draw or summon the grand jury, because by virtue of the act of 1893 they were prohibited from

[Daughdrill v. The State.]

drawing or summoning a grand jury unless at the previous term the judge of the court had ordered it—and in this case he had not ordered it. The judge had no power to order the summoning of the grand jury in question.—*Finley v. The State*, 61 Ala. 201 ; *Hester v. The State*, 103 Ala. 83 ; *O'Brien v. The State*, 91 Ala. 16 ; *Kemp v. The State*, 89 Ala. 52 ; *O'Byrnes v. The State*, 51 Ala. 25 ; *Cross v. The State*, 63 Ala. 40. Any other construction would nullify the whole act.

2. A change of venue should have been granted. Where a defendant can not have a fair and impartial trial in the county in which the indictment is found, a change of venue is a matter of right, and its refusal is revisable by the Supreme Court.—*Seams v. The State*, 84 Ala. 410.

In passing on the application for a change of venue, the trial court should be governed more by the facts of the case, as admitted or proved, than by the mere opinion of witnesses.—*Salm v. The State*, 89 Ala. 56.

3. The motion to quash the venire should have been granted, and defendant's objections to being put on trial should have been sustained. All the fifty jurors drawn should have been summoned. Only forty-seven were summoned. For this reason the venire should have been quashed.—*Roberts v. The State*, 68 Ala. 515 ; *Ward v. The State*, 78 Ala. 441 ; *Martin v. The State*, 77 Ala. 1 ; *Ryan v. The State*, 100 Ala. 105. The special term of the court was not legally called. The order calling it was not spread on the minutes of the court. It was simply written out and filed with the papers in the case. It was no judgment of the court until put on the minutes.—*Hall v. Hudson*, 20 Ala. 284.

4. The court erred in not allowing the jurors J. M. Hopper, J. H. Vinson and A. S. Grimes to be challenged for cause.—*Jackson v. The State*, 77 Ala. 18 ; *King v. The State*, 89 Ala. 146 ; *Clarke v. The State*, 87 Ala. 71.

5. The first and second charges requested by the defendant should have been given. Premeditation is made, by the statute, an essential element of murder in the first degree ; and the killing must have been done under such circumstances as show beyond all reasonable doubt that the mind of the defendant at the time of the killing was in that condition as defined by the four adjectives, willful, deliberate, malicious, and premeditated,

[Daughdrill v. The State.]

contained in the statute defining murder in the first degree.—*Smith v. State*, 68 Ala. 424; *Mitchell v. State*, 60 Ala. 26; *Eiland v. State*, 52 Ala. 334; *Tatum v. State*, 63 Ala. 152; *Coleman v. State*, 59 Ala. 52; *Coon v. Webster*, 5 Cushing, 320; *Fields v. State*, 52 Ala. 353.

WILLIAM C. FITTS, Attorney-General, and AMOS E. GOODHUE, for the State.—Section 4316 of Code provides that if in consequence of any neglect on the part of the judge of probate, sheriff, or clerk of the circuit or city court, *or from any other cause*, no grand or petit jury is returned to serve at any term of the court, the court may, by an order entered on the minutes, direct the sheriff forthwith to summon eighteen persons, qualified to serve as grand jurors. The contingency provided for is when no grand or petit jury is returned to serve at any term of the court.

Manifestly while this Code provision was in force and applied to Etowah county, whenever for any reason no grand jury was returned to serve in the circuit court of Etowah county, the presiding circuit judge could by an order entered on the minutes, cause a grand jury to be summoned by the sheriff. Of course such a failure to have a grand jury summoned could not arise without the neglect of some officer charged with the duty of drawing and summoning a grand jury. But thereafter the act applicable to Etowah county found in Acts 1892-93, page 1193, was passed. The legislature provided by this act that no grand jury should be drawn except in cases where the judge has at the preceding term of the court directed that one should be drawn and summoned, and then added a proviso: "Provided however, nothing in this act shall prevent the presiding judge of such court in term time to cause a grand jury to be impannelled for such court as now provided by law in cases where no grand juries have been drawn." We submit that this proviso was added to prevent just such a construction of the act as is sought to be given to it.

2. There was no error in the refusal of the court to grant a change of venue. The right to a change of venue is given in order to insure a fair trial; and if the affidavits submitted for and against it do not show a clear case, there is no error in refusing the application. The appellate court must be able to see, and see clearly, that

the refusal was wrong.—*Edwards v. State*, 49 Ala. 334 ; *Seams v. State*, 84 Ala. 411 ; *Hawes v. State*, 88 Ala. 50 ; *People v. Goldenson*, 19 Pac. Rep. (Cal.) 161.

3.    The prisoner can not complain because of the failure of the sheriff to find a person whose name is on the list drawn for the trial of the cause.—*McElroy v. State*, 75 Ala. 9 ; *Jackson v. State*, 76 Ala. 26.

4.    There was not shown, upon the examination of the jurors, any ground for a challenge for cause.    The court properly refused to allow the defendant to make such challenge.—*Bales v. State*, 63 Ala. 30 ; *Beason v. State*, 72 Ala. 193 ; *Carson v. State*, 50 Ala. 134 ; *State v. Wilson*, 38 Conn. 140.

5.    The declaration made by the deceased to druggist Cross, immediately after the deceased had been carried into the drug store, was admissible as a dying declaration. *Cole v. State*, 105 Ala. 81 ; *Blackburn v. State*, 98 Ala. 64 ; *Ward v. State*, 78 Ala. 441 ; *People v. Garcia*, 63 Cal. 19 ; *Johnson v. State*, 102 Ala. 1.

6.    The fourth charge requested by the defendant was properly refused.—*Cleveland v. State*, 86 Ala. 1 ; *Lang v. State*, 84 Ala. 1.

7.    The other charges requested by the defendant, which were refused, were misleading and involved, and, therefore, properly refused.—*Shelby v. State*, 97 Ala. 87 ; *Blackshear v. State*, 88 Ala. 35 ; *Smith v. State*, 92 Ala. 30 ; *L. & N. R. R. Co. v. Hurt*, 101 Ala. 34.

McCLELLAN, J.—Section 4316 of the Code provides that, if in consequence of any neglect on the part of the probate judge, sheriff, or clerk of the circuit court, or from any other cause, no grand or petit jury is returned to serve at any term of the court, the court may, by an order entered on the minutes, direct the sheriff forthwith to summon eighteen persons qualified to serve as grand jurors, and the requisite number to serve as petit jurors, and may supply the places of persons so summoned and failing to attend, &c.

By an act "to authorize the judge of the ninth judicial circuit to direct when a grand jury shall be drawn, summoned and impannelled in the circuit court of Etowah county," approved February 21, 1893, it is provided that thereafter no grand jury should be drawn, summoned or impannelled in said circuit court, unless in

[Daughdrill v. The State.]

the opinion of the presiding judge a grand jury should be impannelled; but that if. at any time in the opinion of the judge holding said court a grand jury should be impannelled at the next term of the court, he should make an order to that effect and cause the same to be entered on the minutes of the court, and that without such order the officers charged with that duty under the general law will not draw or summon a grand jury. This act then proceeds and concludes as follows : "*Provided, however*, that nothing in this act shall prevent the presiding judge of such court in term time to cause a grand jury to be impannelled for such court, as now provided by law in cases where no grand juries have been drawn, or in cases where the venire is quashed." This act without the *proviso* just quoted would unquestionably prevent the impannelling of a grand jury for any term of the court except upon an order made at the preceding term. The caption covers authorization to the judge to direct when a grand jury shall be drawn, &c.; section 1 of the act prohibits the impannelling of a grand jury unless the judge is of opinion one should be organized; and section 2—if the *proviso* be not considered—carries authority to direct the impannelling of a grand jury at one term for the next term of the court only. So that but for the *proviso* there would be a positive inhibition upon the impannelling of a grand jury for that court except upon an order made at the preceding term. The *proviso* is clearly covered by the caption of the act; the direction of the judge to impannel a grand jury where no grand jury has been drawn for the term being held, or the grand jury for which has been quashed, is as obviously within the purview of the caption as an order entered on the minutes at the preceding term for the impanelling of such jury. Nor is the *proviso* in any sense repugnant to the body of the act, if that could be objectionable, but is entirely within the terms of the inhibition contained in the first section, limited as that inhibition is to circumstances under which the judge is not of the opinion that a grand jury should be impannelled. But it is insisted for appellant that under the general statute the circuit court has no power to impannel a grand jury at a term then being held unless officers charged with the duty of drawing and summoning such jury had failed to discharge that duty, and in consequence of such neg-

lect of duty no grand jury had been returned to serve at
that term of the court, that the *proviso* to this special act
does not enlarge the operation of the general law on this
point, and that, of consequence, no grand jury can be
presently ordered and impannelled by the Etowah circuit
court when no order to that end had been made at the
preceding term and failed of execution, because this act
imposes no duty of drawing and summoning such jury
on the probate judge, sheriff and clerk under these cir-
cumstances, and the absence of the jury is not "in con-
sequence of any neglect on the part of" said officers.
For the argument, we may admit the soundness of all
these propositions except the first stated, having relation
to the construction of section 4316 of the Code. That
section authorizes the summoning and impannelling of a
grand jury at any term of the court when no grand jury
has been returned for that term for any cause whatever,
whether "in consequence of any neglect on the part of
the judge of probate, sheriff, or clerk   *   *   *   or from
any other cause." It may be that in all the cases which
have arisen and been brought to this court under this
statute the failure of a jury was due to the neglect of the
officers named, and it may not be of ready conception
that such failure could under the general law result from
any other cause ; but it is not impossible, we undertake
to say, that a grand jury should not be returned in con-
sequence of some cause other than the neglect of such
officers.   And the legislature to meet and provide for
such case, gives the authority to presently summon and
organize a grand jury whenever from any cause a grand
jury has not been returned to serve at any term of the
court ; it is the absense of a grand jury, and not the
particular cause of such absence, which presents the
condition upon which the court may proceed to summon
and impannel such jury. That is the construction which
the unambiguous language of the statute demands and
enforces ; and it is the legislative construction put upon
the general law by this *proviso* itself, which vests the
judge with the power in question whenever no grand
jury has been drawn for any cause. The condition for
the exercise of this power existed in this case ; no grand
jury had been returned to serve at the spring term, 1896,
of the Etowah circuit court ; and it is of no consequence
that this was so because the special law had relieved the

officers charged with the duty of drawing and summoning a grand jury under the general law of the performance thereof in respect of that term of said court. The several motions, objections, &c., made by the defendant on the theory that the grand jury which returned the indictment against him was impannelled without authority of law, were properly overruled.

Upon a close examination and full consideration of the evidence adduced on the motion for a change of venue, our conclusion is that on the principles declared by this court in the case of *Hawes v. State,* 88 Ala. 37—wherein a stronger showing for the removal of the cause to another county than is made in the case at bar, was presented, and held to have been properly denied—the trial judge did not err in overruling the motion.

The motion to quash the special venire drawn for the trial of this cause which proceeds on the ground in effect that the sheriff failed to find and summon three of the jurors whose names appear thereon was properly overruled.—*McElroy v. State,* 75 Ala. 9; *Jackson v. State,* 76 Ala. 26. The question is not like that discussed in *Ryan v. State,* 100 Ala. 106, 108, where the *venire* was to be made up in part of regular jurors *summoned* for the week, and it did not appear but that the names of persons drawn for the regular juries, but not summoned, had been included in the list of jurors for the particular trial.

It was not essential to the validity of the order for the special term at which this case was tried that it should be entered upon the minutes of the term which was being held when the order was made. The order is that of the judge and not that of the court, and it has no place on the minutes because it happens to have been made during a term. It should be, and was in this instance, entered upon the minutes of the special term. That was essential and sufficient—Code of 1886, § 752.

The court did not err in disallowing defendant's challenges of the jurors Shores, Hopper, Vinson and Guinn. The fact that each of these jurors believed that if what they had heard about the case was true the defendant was guilty and should be hung, afforded no ground for challenge, when each of them further deposed that they did not assume to know whether the reports they had heard were true, and that they had no fixed opinion as

[Daughdrill v. The State.]

to defendant's guilt or innocence which would bias their verdict.—*Carson v. State*, 50 Ala. 134 ; *Beason v. State*, 72 Ala. 191, 193 ; *Bales v. State*, 63 Ala. 30.

It is no objection to a venire for the trial of a capital case at a special term that it was drawn more than ten days before the commencement of the term. The requirement of section 4319, that such venire should be drawn ten days before the term, is intended to secure ample time for summoning the jurors and this purpose obviously is served by drawing the names more than ten days before the court convenes. The statute, indeed, is to be read as if it had provided that the drawing should take place at least ten days, or ten days or more, before the term.

There can be no doubt that the evidence shows that Bates, the deceased, was under a sense of impending dissolution—believed that he was mortally wounded and about to die—when he charged the witness Cross with a message to his wife detailing the facts and circumstances of the difficulty in which he received the fatal hurt. That the statement he then made to Cross took the form of a message to the dying man's wife, instead of that of a statement for the information of the witness and made directly to him, renders it none the less admissible as a dying declaration. The imminency of death supplying the place of the unction of an oath, the declaration whether made to one or another, or to one to be transmitted to another, is to be taken as evidence of the facts stated, there being the same probability of the truth of the statement in either form.

The evidence tended to show that defendant and deceased were entire strangers to each other. · Deceased was engaged in conversation with the proprietor of the saloon in which the homicide occurred, when defendant approached and interrupted them. Deceased said he and the proprietor were talking on business, and did not want to be interrupted. He told defendant to go away and let them alone. Upon this the defendant applied a very opprobrious epithet to the deceased.´ The latter said he would not or could not take that. Defendant said you will have to that or worse, and stepped back a few feet. Deceased advanced somewhat toward the defendant, with one arm held up in front of him and the other by his side. Thereupon defendant drew a pistol

and shot deceased through the body. It seems that deceased had ceased to advance when the shot was fired. He had no arms, nor made any demonstration as if to draw or use a weapon. From this summary of the case an appreciation of the sudden and unanticipated character of the rencountre and the rapidity of the succession of events, culminating in the fatal shot, may be had. The whole occurrence occupied only a few moments of time. Notwithstanding the spontaneity, so to say, of the difficulty, and the rapidity of action with which it progressed, it is, of course, clear that there was quite sufficient time, while it was passing, for every mental condition of murder in the first degree to have found lodgment in the mind of the slayer and co-existed there at the time the shot was fired. Yet it is a case particularly inviting to a specious use of the terms "with malice aforethought," "deliberate," "premeditated," &c., &c.; in rebuttal of the idea that the defendant took the life of the deceased with unlawful formed design, and one upon which the jury were especially exposed to being misled by the supposed paraphrases, synonyms or equivalents of or for the words of the statute in argument and instructions addressed to them. This is illustrated in many of the charges requested by the defendant on the trial below. The first and second instructions refused to the defendant will serve as examples of this. They are: Charge 1. "Premeditation means a prior determination on the part of the defendant to take the life of Bates; and if the jury are not satisfied from all the evidence in the case beyond all reasonable doubt, and have an abiding conviction to a moral certainty, that the defendant had a prior determination to take the life of Bates before he fired the shot, the jury can not convict him of murder in the first degree." Charge 2. "Premeditation means to think on or revolve in the mind beforehand, and unless the jury are satisfied beyond all reasonable doubt, and have an abiding conviction to a moral certainty, from all the evidence in the case, that the defendant had time to think and revolve or turn over in his mind the probable consequences of his act before he fired the shot, and that the defendant contrived and designed previously to the firing of the shot to take the life of Bates, the jury cannot find the defendant guilty of murder in the first degree." The manifest tendency

of these charges, when referred to the evidence in the case, was to mislead the jury to the conclusion that to constitute murder in the first degree the defendant should have time and opportunity to thoroughly ponder upon the act and its consequences, and resolve upon its commission before and disconnected from the act itself. This, of course, is not the deliberation and premeditation which are essential and sufficient ingredients of murder in the first degree; it is much more than the law requires. "Deliberate" and "premeditated," as those words are used in the statute, means only this : that the slayer must intend before the blow is delivered, though it be for only an instant of time before, that he will strike at the time he does strike, and that death will be the result of the blow ; or, in other words, if the slayer had any time to think before the act, however short such time may have been, even a single moment, and did think, and he struck the blow as the result of an intention to kill, produced by this even momentary operation of the mind, and death ensued, that would be a deliberate and premeditated killing within the meaning of the statute defining murder in the first degree.—Code of 1886, § 3725 ; *Cleveland v. State*, 86 Ala. 1, 9 ; *Lang v. State*, 84 Ala. 1, 5 ; *Mitchell v. State*, 60 Ala. 26.

Charges 3, 4, 5, 6, 7, 8 and 11 are subject to the same objection pointed out to charges 1 and 2 above, and for the same reason they were each properly refused. Charge 8 seems to embody in express terms the incorrect notion of premeditation which the jury might well have been misled to adopt by the language of the other instructions on this subject refused to the defendant. Its language is : "Unless the jury are satisfied   *   *   * that there was a preconceived purpose on the part of the defendant at the time of the shooting of Bates to take his life, and the jury have not an abiding conviction to a moral certainty, and the evidence is not so strong and convincing as to exclude every reasonable supposition or hypothesis that the defendant, at the time of the shooting, had in his mind this preconceived purpose to take the life of Bates they cannot find him guilty of murder in the first degree." Here, obviously, the purpose to kill is expressly required to be something other than an intent formed on the instant before the killing : the defendant must have formed the purpose as something

[Daughdrill v. The State.]

apart from its entertainment at the time of the killing, and kept it in his mind or recalled it to his mind when he was about to inflict the fatal wound. This charge would seem to be, therefore, not only misleading, but affirmatively bad. Many of these charges are also misleading when reference is had to the evidence in their use of the words "sudden rash act." Without defining what is meant by this phrase, they instruct the jury that if the killing was the result of a sudden rash act the defendant cannot be guilty of murder in the first degree. Now, in common parlance, the act of the defendant was sudden and rash whether it was committed with or without the formed design essential to murder in that degree, and the jury might have believed that it was deliberate and premeditated in the sense of the law, and yet have found that it was, in a sense, sudden and rash. Upon such a conclusion, the necessary tendency of these charges would have been to mislead them to an acquittal of murder in the first degree.

Moreover, charges were given by the court at the defendant's request covering all the matters to which the charges we have been considering were addressed, which were as favorable to the defendant as the law admitted of, and in some instances more so.

Charge 10 refused to the defendant is an effort to add qualifications or characteristics to the intention to kill, necessary in murder in the first degree, which could tend only to confuse and mislead the jury. There is no necessity or occasion for requiring the triers of fact, when they find that a defendant had in his mind an intention, resulting from thinking upon the matter for even so brief a time, to take life, to go further into metaphysical inquisition to determine whether such intention was "clear" or was "specific."

Charge 12 asked by defendant is abstract. There is no evidence that defendant and Bates engaged in a combat, nor that the latter assailed or attacked the former.

Charge 13 would have done violence to the doctrine that mere words, or a mere altercation can not reduce the grade of a homicide to manslaughter.

Charge 14 requested by the defendant is as follows: "If the jury are satisfied beyond a reasonable doubt that defendant is guilty of some one of the degrees of homicide, but the evidence leaves it in doubt whether

3

the offense is murder or manslaughter, then the defendant is entitled to the benefit of the doubt, and could only be convicted of manslaughter." This charge would have authorized and required the jury to convict of manslaughter only though they believed beyond all *reasonable* doubt that he was guilty of murder. It was properly refused.

Common knowledge and the evidence in this case concur to the conclusion that a gun shot wound through the lungs and substantially through the body is, to say the least, a dangerous wound. No evidence was adduced below to the contrary. Nor was there any evidence to the effect that only ten or fifteen per cent. of persons so wounded died. Charges 15, 16, 17, 18, 23, 26 and 27 were each bad for that they either assume or authorize the jury to capriciously conclude that Bates' wound was not dangerous, or that only ten or fifteen per cent. of such wounds are fatal.

It was not necessary to a conviction in this case that the wound should have been "necessarily fatal." A defendant can not escape the penalties for an act which in point of fact produces death, because death might possible have been averted by some possible mode of treatment. The true doctrine is, that where the wound is in itself dangerous to life mere erroneous treatment of it, or of the wounded man suffering from it, will afford the defendant no protection against a charge of unlawful homicide.—*Parsons v. State*, 21 Ala. 300; *McAllister v. State*, 17 Ala. 434; *McDaniel v. State*, 76 Ala. 1, 6; *Bowles v. State*, 58 Ala. 335; Russell on Crimes, (Int. ed.), pp. 35-6; *Regina v. McTyre*, 2 Cox. C. C. 379; *Regina v. Davis*, 15 Cox C. C. 174.

Charges 19 and 20 refused to the defendant were bad upon the principle just stated.

Charges 21, 24 and 25 take no account of the dangerous character of the wound. If the law were as these instructions undertake to declare it, the jury would have been authorized to acquit though the wound was inherently dangerous to life and the opiate administered to Bates was administered by a competent practitioner in good faith to save the life thus endangered by the wound.

Charge 22 is confused in its statement of the proposition probably intended to be advanced. We suppose it

was intended to be asserted by this instruction that if the evidence was not sufficiently strong to exclude every reasonable hypothesis other than that the wound caused the death, defendant should be acquitted; but this is not the proposition really stated, if we understand what is said. The language used in this connection is this : "If after considering all the evidence, the jury have not an abiding conviction to a moral certainty, and the evidence is not so strong and convincing as to exclude from the minds of the jury every reasonable supposition or hypothesis, that the wound inflicted on Bates was necessarily fatal or dangerous and that Bates did not die from the effects of the wound, they can not find the defendant guilty as charged in the indictment." Our effort to comprehend this language has resulted in the conclusion, which, however, we do not state with absolute confidence, that its effect is to instruct the jury to acquit if the evidence failed to exclude every reasonable supposition that the wound killed Bates, and also every reasonable supposition that the wound did not kill Bates. The court very properly declined to set the jury wrestling with this confused and self-contradictory charge. Charge 27 is open to the same objection.

Charge 26 refused to the defendant has a fault which is common to most of those already considered, having reference to the cause of Bates' death, and which is quite sufficient to condemn it and them. That fault is than an absolute acquittal is demanded if it should appear that the wound did not cause the death of Bates, though it was entirely open to the jury, had they found that the doctors and apothecaries and not the defendant killed Bates, to have convicted the defendant under this indictment of an assault with intent to murder.

With reference to all the charges as to the cause of Bates' death refused to the defendant, it may be further said, though there is no occasion to formally so decide, that it seems to us they are wholly abstract. We are not at all inclined to think that there is any evidence in the record tending to support the theory upon which these instructions were requested, viz., that the wound inflicted by the defendant was harmless to the life of Bates, and that he was killed by opiates administered in the treatment of the wound.

We have written upon all the points discussed in the

briefs of counsel, and upon some that were not. All others have been considered. And we find no error in the record. The judgment below must be affirmed.

And the day fixed by the circuit court for the execution of the sentence of death imposed upon the defendant having passed, it will be here ordered that said sentence be carried out and executed as required by law on Friday, the 5th day of March, 1897.

Affirmed.